IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GILBANE BUILDING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 2260 |
| | ) | |
| DOWNERS GROVE COMMUNITY | ) | Judge Rebecca R. Pallmeyer |
| HIGH SCHOOL DISTRICT NO. 99 | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION & ORDER

This matter is before the court for ruling on third-party defendant Healy, Snyder, Bender & Associates' ("HSB") *Emergency Motion to Strike [plaintiff/counterdefendant] Gilbane's Supplemental Expert Report and for Sanctions* ("motion to strike), which defendant/counterplaintiff/third-party plaintiff Downers Grove Community High School District No. 99 (the "District") has joined. For the reasons explained below, the court grants the motion to strike to the extent HSB and the District ask the court to bar Gilbane from using the opinions set forth in the supplemental expert report at trial and awards reasonable attorneys' fees relating to the motion, but denies the remaining sanctions that HSB and the District seek.

## I.       BACKGROUND

Before explaining the reasoning underlying the court's ruling, it is first necessary to set forth in detail the factual background that led up to Gilbane's supplemental expert report and HSB's motion to strike that report.

This litigation relates to a construction project at Downers Grove North and South High Schools. The District, as owner, hired HSB as the architect and Gilbane as the construction

manager for the project (the "Project"). Gilbane sued the District in March 2002 for breach of contract, alleging that the District owes Gilbane more than $2 million for additional labor costs and direct job costs that Gilbane incurred in handling numerous delays and disruptions in work caused by acts and events that were beyond Gilbane's control. For example, Gilbane contends it had to commit more resources and more employee-time to the Project in order to address problems discovered in the architectural drawings, problems with trade contractors, etc. The District filed a counterclaim against Gilbane for breach of contract and negligent misrepresentation, alleging that Gilbane failed to adequately perform its duties as construction manager, and that as a result the District has incurred additional expenses exceeding $2 million. The District also filed a third-party complaint against its architect, HSB, alleging that in the event the District is found liable to Gilbane for damages caused by the failure of HSB to adequately perform its services as the architect, then HSB is liable to the District for such damages.

This matter was originally set to go to trial on December 6, 2004. Fact discovery in this case closed on July 15, 2004. (Minute Order of 5.07.04.) Under the terms of an agreed order entered on May 7, 2004, Gilbane and the District had until August 15, 2004 to disclose the names and reports of all expert witnesses, and the depositions of those experts were to be completed by September 15, 2004. (*Id.*) HSB, as third-party defendant, was scheduled to disclose the names and reports of its expert witnesses by September 15, 2004. (*Id.*) Gilbane and the District's rebuttal opinions also were to be disclosed by September 15, 2004, and the depositions of HSB's experts and any rebuttal experts were to be completed by October 15, 2004. (*Id.*)

As part of its expert disclosures, on August 16, 2004, Gilbane disclosed Gilbane employees Steve Rothamer, Jerry Kocko and Mark Karaskiewicz as its expert witnesses

2

regarding construction scheduling, and disclosed their joint expert report entitled "Scheduling and Management Staffing Impacts" (the "Expert Report"), which offered opinions regarding events that occurred on the Project that affected scheduling of the Project and the manpower Gilbane had to commit to the Project.[1] To demonstrate and supplement the narrative opinions, the Expert Report included a project schedule update, dated October 15, 2000. Karaskiewicz, Kocko and Rothamer created the project schedule update by taking two of the actual schedules from the Project (one from Downers Grove North High School and one from Downers Grove South High School) to use as baselines, and updating those schedules to show how numerous delays had affected the Project by the Fall of 2000, and to show the measures Gilbane utilized to mitigate the effects of those delays on the Project schedule. (Gilbane Expert Report, Tab 1.A and Tab 5.)

Gilbane also disclosed Michael Callahan as its expert on scheduling methodology.[2] Callahan's expert report explained, in relevant part, that he was retained to "assist and advise Gilbane in the preparation of its schedule analysis to be used for identifying durations and causes

---

[1] The Gilbane Expert Report dated August 16, 2004 is HSB exhibit 2 from the August 2004 evidentiary hearing.

By way of example only, the Expert Report states that the contract documents relating to a new masonry wall in Building A at Downers Grove North High School failed to include adequate masonry reinforcing steel. Although HSB agreed that additional reinforcing steel was necessary, both HSB and the District initially refused to authorize a change order that would define the additional, necessary work as extra work beyond the scope of the masonry trade contractor's original contract. HSB and the District eventually authorized a change order several months later, but the delay not only forced the masonry trade contractor to reallocate its resources but also significantly impacted subsequent work on the masonry, steel, roofing, windows, doors, floor slab, etc. (Gilbane Expert Report, Tab 1.B at 4.)

[2] Although Gilbane also disclosed other experts, those experts are not relevant to the pending motion to strike.

3

of delays in connection with the renovation and construction of the Downers Grove North and South High Schools . . . .," and that the methodology that Karaskiewicz, Kocko and Rothamer used to create the project schedule update was a recognized and well-accepted method. (Callahan expert report, Gilbane's Resp. Emerg. Mot. Strike, Ex. 2, ¶¶ 2.1, 4.1.) To explain it another way, Callahan instructed Karaskiewicz, Kocko and Rothamer how to perform the project schedule update, but Karaskiewicz, Kocko and Rothamer reviewed the facts and records, performed the actual analysis, and prepared the Expert Report.

Whereas Gilbane's experts maintain that there is ample information from the Project to assign responsibility for various delays on the Project and to assess the impact of those delays, the District's expert disagrees. On August 16, 2004, the District disclosed Joseph P. Manzi as its scheduling expert. In his expert report, among other opinions, Manzi concluded that the schedules from the Project that Gilbane produced during discovery provide an insufficient basis for Manzi to formulate an opinion regarding the effect of any delays that occurred during the Project on the final end date of the Project because, according to Manzi, Gilbane failed to produce Master critical path method schedules ("CPMs") for the majority of the Project. A Master CPM schedule, as described by Manzi, "is a comprehensive schedule for the entire Project showing all work performed and to be performed during the project" that includes (i) actual start dates for work that has been started, (ii) actual completion dates for work that has been completed, (iii) planned start dates, planned duration dates and planned completion dates and float for work not yet performed, and (iv) an indication of which tasks must precede other tasks, and which must succeed other tasks. (Manzi Aff. 6.27.04, ¶ 3.)[3] A Master CPM schedule

---

[3]Manzi's affidavit is available in the court file, docket entry 91.

also indicates which tasks are on the critical path (meaning that if those tasks are delayed, there will be a delay in the project's completion date) and which tasks have float (which means there is a certain amount of time that the task can be delayed without affecting successor activities and the completion date). In Manzi's opinion, complete Master CPM schedules are essential to be able to assess the length of the delays on the Project and to determine responsibility for those delays. In his expert report, Manzi opined that "[a]bsent a complete master schedule network, the critical path of the Project cannot be determined and the impact of any Project event on the end date of the Project cannot be determined." (Manzi expert report at 36.)[4]

The fundamental disagreement between Gilbane's experts and the District's expert was explored on August 20, 23 and 24, 2005, during an evidentiary hearing the court held regarding the District's *Motion for Sanctions for Spoliation of Evidence and Other Relief* ("spoliation motion"). In the spoliation motion, the District alleged that Gilbane had failed to produce many of its daily contractor reports, had failed to produce trade contractor reports, and had failed to produce critical path method ("CPM") schedules for the project.[5] According to the District and its scheduling expert, Joseph Manzi, without those documents, the District could not adequately present a defense or present its counterclaim for damages, so the District asked the court to bar Gilbane from introducing any evidence that Gilbane was not responsible for delays on the project. The purpose of the evidentiary hearing was to assess whether CPM schedules were

---

[4]Manzi's expert report dated August 16, 2004 is Gilbane Exhibit 4 from the August 2004 evidentiary hearing.

[5]The court shall discuss the spoliation motion only to the extent it is relevant to the pending motion to strike.

actually missing,[6] whether there were alternate sources of information available to compensate for any missing documents so that a reasonable expert would be able to formulate an opinion regarding the construction delays, and whether CPM schedules were necessary for an expert to be able to form an opinion regarding who bears responsibility for the delays on the Project. Accordingly, the court invited the parties to present expert testimony regarding whether it would be possible to prepare an expert report in this case with the available documents. The court, however, repeatedly and expressly informed the parties that the purpose of hearing expert testimony was not to assess the sufficiency of the disclosed expert reports. Indeed, during the evidentiary hearing, the court specifically reminded counsel that the purpose of the evidentiary hearing was to address spoliation, not to conduct a mini-*Daubert* hearing. (*E.g.*, 8.23.04 Evidentiary Hearing Tr. at 428:7-10.) Manzi, Callahan, Kocko, and Rothamer each testified as experts at the evidentiary hearing.

When the evidentiary hearing was nearly finished, the parties expressed an interest in pursuing settlement negotiations. As a result, on August 31, 2004, the court stayed expert discovery in order to maximize the amount of money available toward potential settlement. Because it would have been impossible to conduct settlement negotiations, pursue certain discovery issues relating to electronic evidence that arose during the evidentiary hearing, complete expert discovery, prepare the final pretrial order and get ready for trial by December 2004, it was evident that the trial needed to be rescheduled. The parties had the opportunity to

---

[6]According to Gilbane, there are no missing schedules–all of the schedules that were created during the Project (whether CPMs or other types of schedules such as bar charts) were given to the District during the Project and have been produced in hard copy form during discovery. This is an issue the court will be addressing in its ruling on the District's spoliation motion, which was amended in January 2005 and is now fully briefed.

consent to the jurisdiction of the Magistrate Judge, whose trial schedule was more flexible than the district court's, or, alternatively, to accept that the earliest possible trial date they would get with the district court would be in September 2005. HSB declined to consent, and also opposed rescheduling the December trial date. This court overruled HSB's objection to rescheduling the trial, however, and the district court struck the December 2004 trial date, so the parties proceeded with settlement negotiations with the understanding that in the event the case did not settle, the earliest they would go to trial would be in September 2005.

Settlement negotiations began on September 21, 2004 and continued throughout the Fall of 2004, but on January 3, 2005, the parties informed the court that they had been unable to reach a settlement. As a result, the court held a status hearing on January 11, 2005 to address several pending motions, including a *Daubert* motion HSB had just filed challenging Gilbane's Expert Report written by Karaskiewicz, Kocko, and Rothamer.

Specifically, HSB filed a *Motion to Strike Certain Expert Reports and to Bar Opinion Testimony of Certain Expert Witnesses of Gilbane* ("HSB's *Daubert* motion"), asking the court to strike Gilbane's Expert Report and to bar Karaskiewicz, Kocko and Rothamer from testifying at trial, contending that the report "was not prepared by experts, is based upon insufficient documentation and data, and does not apply reliable principles and methods that are generally accepted in the relevant expert community[.]" (HSB's Mem. Support Daubert Mot. at 2.) HSB also argued that the Expert Report was incomplete because Gilbane's employee-experts failed to follow Callahan's recommended methodology.[7] HSB further asked the court to strike Callahan's

---

[7]As noted earlier, Gilbane's Expert Report includes one project schedule update dated October 15, 2000. At the evidentiary hearing, Callahan testified that he recommended that Karaskiewicz, Kocko and Rothamer perform a series of forward-looking schedules. (8.20.04

expert report and bar his testimony. The *Daubert* motion was based on the written expert reports and testimony elicited at the evidentiary hearing on the spoliation motion in August 2004; expert depositions had not yet been taken. At the status hearing on January 11, 2005, the court set a briefing schedule for HSB's *Daubert* motion, requiring Gilbane's response by February 1, 2005 and HSB's reply by February 15, 2005. When Gilbane filed its opposition to HSB's *Daubert* motion on February 7, 2005,[8] Gilbane opposed the challenge on the merits, arguing that its experts are qualified to testify and that Karaskiewicz, Kocko and Rothamer utilized an appropriate methodology.

While the *Daubert* motion was being briefed, HSB filed a motion with the district court asking for a new trial date. When the December trial date was cancelled last Fall, the earliest opening in the district court's trial schedule was not until September 2005, but by January 2005, the district court's trial schedule had changed. According to Gilbane, both Gilbane and the District opposed the June trial date on the grounds that the parties would not have an opportunity to adequately conduct expert discovery. "Although sympathetic with the hardship a June trial date would cause," (Gilbane's Resp. Emerg. Mot. Strike at 10), on February 3, 2005, the district court granted HSB's motion over the District and Gilbane's objections, ordered the parties to submit the final pretrial order by June 1, 2005 and scheduled the trial to commence on June 27, 2005. The district court left it to this court to set an expert discovery schedule.

The parties did not immediately inform this court that the trial date was set for June, and

---

Evidentiary Hearing Tr. 414:2-18.) When asked whether Karaskiewicz, Kocko and Rothamer's analysis would be incomplete if they performed only one schedule update, rather than a series of updates, Callahan answered "yes." (*Id.* at 414:15-18.)

[8]Gilbane's response date was extended by agreement of the parties.

that they needed an expert discovery schedule. Instead, nearly two weeks after the district court set the new trial date, HSB filed a motion asking this court to set an expert discovery schedule, and did not notice the motion for presentment until ten days later, on February 25, 2005. On February 25, 2005, the court set the expert discovery schedule as follows: (1) all depositions of Gilbane and the District's expert witnesses shall be completed on or before April 4, 2005; (2) on or before April 18, 2005, HSB shall disclose the names and reports of all expert witnesses, and the depositions of such disclosed expert witnesses shall be completed on or before May 2, 2005; on or before May 2, 2005, Gilbane and the District shall disclose any rebuttal opinions and new rebuttal experts' names and reports, and the depositions of such rebuttal witnesses shall be completed on or before May 16, 2005; and (4) all discovery in this matter shall be completed on or before May 16, 2005. (Minute Order of 2.25.05.)

At the February 25, 2005 hearing, the court also addressed HSB's pending *Daubert* motion, informing HSB that the court would not rule on the motion until after the challenged experts had been deposed because it would be a waste of time and resources for the court to rule on HSB's *Daubert* motion, only to have HSB revisit the issue again after expert depositions had been completed in the event the court denied the motion. (2.25.05 Tr. 36:2-22.) The court thus entered and continued the *Daubert* motion and set a schedule for HSB and Gilbane to file supplemental briefs after the experts' depositions. (Minute Order of 2.25.05.)

On March 10, 2005, Gilbane filed an *Emergency Motion to Supplement Gilbane's Schedule and Management Staffing Impacts Expert Report*, which the court heard the following morning. The proposed supplemental report was not attached to the motion because it was not complete yet, but Gilbane explained that it was seeking leave to supplement the Expert Report to

9

include (i) an analysis of the additional electronic scheduling information that Gilbane had recently retrieved and produced pursuant to the court's order, and (ii) to address certain issues raised in HSB's *Daubert* motion. Gilbane further explained that because HSB had filed a *Daubert* motion challenging the sufficiency of Gilbane's Expert Report on the basis that the Expert Report was incomplete, "Gilbane's experts began working to supplement the Expert Report with the understanding there was ample time to complete expert discovery in light of the September 2005 trial date[,]" but then the trial date was set for June instead of September at HSB's request, which drastically accelerated the expert discovery schedule and prompted the emergency motion to supplement. (Gilbane's Emerg. Mot. for Leave to Supplement Expert Report at 2.) In support of its motion to supplement, Gilbane argued that it had a duty to supplement the Expert Report under Rule 26(e)(1) of the Federal Rules of Civil Procedure, which requires supplementation in the event an expert report is incomplete. Gilbane also contended that supplementation would not affect the expert discovery deadlines set by the court on February 25, 2005, and further argued that granting the motion to supplement would "facilitate (or obviate the need for) the Court's analysis" of HSB's pending *Daubert* motion. (*Id.* at 4.) Moreover, Gilbane maintained that it would be prejudiced both at trial and in responding to the *Daubert* motion if it were not given leave to supplement the Expert Report.

After hearing oral argument, over objections from both the District and HSB, the court gave Gilbane leave to supplement its Expert Report by March 18, 2005, in large part because of the court's impression that allowing supplementation might expedite resolution of the *Daubert* motion. (3.11.05 Tr. 13: 19-14:3.) In granting the motion, the court noted that it would not change expert discovery dates because there was no time to do so in light of the June trial date.

10

(3.11.05 Tr. 6:12-14, 8:15-18.)  The deadline for deposing Gilbane's experts thus remained April 4, 2005.  (*Id.* 14:4-5.)

The following week, at the end of the business day on Friday, March 18, 2005, Gilbane served the District, HSB and the court with copies of its supplement to the Expert Report, entitled "Gilbane Building Company – Delay and Manpower Impact Report for Downers Grove North and South High Schools" ("CCL Report").[9]  The CCL Report is a 37 page, single-spaced document which was prepared by Callahan's consulting firm CCL Construction Consultants, not by Gilbane's employee-experts Karaskiewicz, Kocko and Rothamer.  To be specific, the CCL Report was prepared by "Scott Shafter and Raj Chelluri with assistance from David Streiler, under the direct supervision of Michael Callahan."  (CCL Report at 2.)  The report was accompanied by a binder that is five-inches thick containing thirty-seven exhibits to the CCL Report.  Many of those exhibits consist of detailed computer reports.

On Tuesday, March 22, 2005, HSB filed the motion that is presently before the court for ruling: *HSB's Emergency Motion to Strike Gilbane's Supplemental Expert Report and for Sanctions*, which the District joined.  The court heard oral argument on the motion to strike the following day, received Gilbane's opposition brief on Friday, March 25, 2005, and received HSB's and the District's respective reply briefs on Monday, March 27, 2005.

**II.  DISCUSSION**

The crux of the pending motion to strike is that rather than supplementing the Gilbane employee-experts' opinions, Gilbane instead offered an entirely new set of opinions by different experts.  Moreover, when Gilbane filed its motion for leave to supplement, Gilbane never

_____

[9]The CCL Report, without exhibits, is attached as Exhibit H to HSB's motion to strike.

11

mentioned that it intended to "supplement" the Gilbane employee-experts' Expert Report with opinions from additional expert witnesses. HSB thus argues that the CCL Report is not a proper supplementation under Rule 26(e)(1) of the Federal Rules of Civil Procedure, and that the timing of the CCL Report is unjustified and highly prejudicial to HSB and the District because there is not sufficient time for their experts "to digest this new report and prepare a response to it in the time remaining for completion of expert discovery." (HSB's Emerg. Mot. Strike at 21.) Accordingly, HSB urges the court to bar Gilbane from using "the contents of the CCL Report, the untimely undisclosed witnesses identified in the CCL Report, and their opinions." (*Id.* at 22.) HSB further asks to court to sanction Gilbane by dismissing Gilbane's complaint, barring Gilbane from introducing any testimony regarding its original Expert Report, striking Callahan's expert report, and barring Karaskiewicz, Kocko, Rothamer and Callahan from testifying. (*Id.* at 24.)

Gilbane counters that it has consistently informed counsel and the court of its intention to supplement its previous expert disclosures "regarding scheduling delays and the increased manpower Gilbane was forced to expend on the [Project]." (Gilbane's Resp. Emerg. Mot. Strike at 1.) Additionally, Gilbane urges the court to find that the CCL Report is a proper supplementation under Rule 26(e) on the grounds that (i) "the opinions and conclusions expressed in the [CCL Report] simply serve to make the information set forth in Gilbane's previous disclosure more complete[,]" (*id.* at 2); (ii) a party may supplement its expert report to overcome deficiencies alleged by the opposing parties; and (iii) Callahan, who would be the testifying expert regarding the CCL Report, was previously disclosed as an expert witness. Gilbane further argues that the CCL Report should not be stricken as a sanction under Rule 37(c)

12

because Gilbane would be unduly prejudiced if required to proceed to trial without the benefit of the CCL Report whereas neither HSB nor the District would be prejudiced if the supplementation is allowed. Alternatively, Gilbane maintains that the CCL Report constitutes a rebuttal disclosure under Rule 26(a)(2)(C).

As explained below, the motion to strike is granted to the extent HSB asks the court to bar Gilbane from using the opinions set forth in the CCL Report at trial, primarily because the court finds that HSB and the District would be unfairly prejudiced if the CCL Report is allowed at this late date.

## A.    The Rules Governing Expert Disclosures

Under the agreed scheduling order issued on May 11, 2004 and the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure, Gilbane had to disclose the names of its expert witnesses and their reports by August 16, 2004. Rule 26(e)(1) imposes a duty on a party to supplement its Rule 26(a)(2) expert disclosures at appropriate intervals "if the party learns that in some material respect the information disclosed is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(e)(1); *Wilson v. Sundstrand Corp.*, Nos. 99 C 6944, 99 C 6946, 2003 WL 22012673, at *7 (N.D. Ill. Aug. 25, 2003). Any supplemental disclosures must be disclosed no later than thirty days before trial. Fed. R. Civ. P. 26(e)(1) and 26(a)(3).[10]

If a party fails to disclose information required by Rule 26(a) or 26(e)(1), the party may be barred under Rule 37(c) from using the information that was not disclosed. Fed. R. Civ. P.

---

[10]Under Rule 26(e)(1), supplemental disclosures are due when the party's disclosures under Rule 26(a)(3) are due. Fed. R. Civ. P. 26(e)(1). Under Rule 26(a)(3), disclosures are due at least thirty days before trial unless the court orders otherwise. Fed. R. Civ. P. 26(a)(3). Here, because the court did not set a deadline for supplemental disclosures, the default deadline applies.

37(c). Although the Seventh Circuit has stated that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless[,]" the Seventh Circuit has also held that "[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citations and internal quotation marks omitted). Additionally, according to the Seventh Circuit, the following factors should guide the district court in exercising its discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or wilfulness involved in not disclosing the evidence at an earlier date." *Id.*

Here, if the CCL Report constitutes a supplement to the Gilbane employee-experts' Expert Report, the CCL Report is arguably appropriate in light of the obligation to supplement under Rule 26(e)(1).[11] *But see Wilson*, 2003 WL 22012673, at * 7 ("there are no doubt some limitations on a party's ability to supplement prior disclosures"). On the other hand, if the CCL Report is more akin to a new report than a supplement, the disclosure is untimely in violation of Rule 26(a) and the court's expert discovery scheduling order. In that case, the court must determine whether the Rule 26(a) violation is either justified or harmless. As for Gilbane's alternative argument, if the CCL Report qualifies as a rebuttal report, it is timely because rebuttal disclosures are not due until May 2, 2005. These issues are addressed below.

---

[11]Leave of court is not required before a party may supplement its expert disclosures. *Wilson*, 2003 WL 22012673, at * 7. Rather, it is the opposing party's obligation to bring any objections to supplemental disclosures to the court's attention. *Id.* Gilbane nevertheless sought leave to supplement because it correctly anticipated that there would be objections to its supplemental disclosures.

**B.** **The CCL Report Cannot Be Fairly Characterized as a Supplemental Report**

Invoking Rule 26(e)(1), Gilbane argues that it had a duty to supplement the Expert Report

in response to HSB's *Daubert* challenge that the Expert Report was incomplete. The court

agrees that there are circumstances in which a party should be allowed to supplement in response

to criticisms or deficiencies raised by opposing parties, such as a *Daubert* challenge. *E.g.*,

*Wilson*, 2003 WL 22012673, at *7 (supplementation not inherently improper just because the

supplementation was prompted by questions or challenges to the expert's opinions raised by

opposing counsel); *Confederated Tribes of Siletz Indians v. Weyerhauser Co.*, No. CV 00-1693-

PA, 2003 WL 23715981, at *2 (D. Or. Jan. 21, 2003) (declining to exclude supplemental expert

testimony that was disclosed in response to opponent's challenges to the original expert report,

finding no basis to exclude "simply because Plaintiffs failed to anticipate the need for it until the

defect was pointed out by their opponent"). The problem with Gilbane's position is that the

court cannot fairly characterize the CCL Report as a supplemental report.

The Federal Rules of Civil Procedure do not define what constitutes a supplemental

expert report. However, by its nature, a supplemental expert report necessarily contains

information that was not expressed in the original report, or there would be no need to

supplement. *See Wilson*, 2003 WL 22012673, at *7 (expert supplemented his report to provide

more specific information that was not included in original report); Black's Law Dictionary 1438

(6th ed. 1990) (defining "supplemental" as "[t]hat which is added to a thing or act to complete

it"). A revised expert report that is consistent with the core opinions expressed in the original

expert report is likely to qualify as a supplemental report. *See Allstate Ins. Co. v. Maytag Corp.*,

No. 98 C 1462, 1999 WL 203349, at *6 (N.D. Ill. Mar. 30, 1999). Depending on the facts of the

15

case, a revised expert report that utilizes an additional method of analysis and offers additional

conclusions that were not part of the original report may also constitute a supplemental report.

*See Confederated Tribes*, 2003 WL 23715981, at *2 (experts appropriately supplemented report

to provide additional data analysis that opponent had claimed was missing). The line between

supplemental opinions and new opinions is not always clear, and the decision regarding how to

make the distinction likely depend on the facts of the case. Here, although the CCL Report

resembles a supplemental report in certain respects, from an overall perspective, the court finds

that it would be unfair to characterize it as anything other than a new report.

This is not a case in which the previously disclosed experts submitted supplemental

information regarding their original expert opinions. Rather, Gilbane has submitted additional

information, prepared by a different expert, to bolster the original Expert Report. Gilbane argues

that the CCL Report qualifies as a supplement—even though it was prepared by a different

expert—because it "simply serves to make the information set forth in [the previously disclosed

Expert Report] more complete." (Gilbane's Resp. Emerg. Mot. Strike at 2.) In support of this

argument, Gilbane offers an affidavit from Callahan, who attests that in February 2005, he was

asked to take the Expert Report and "make it more definitive by expanding upon it with greater

detail, providing further justification of the delay impacts and completing additional schedule

updates spanning the duration of the [Project]." (*Id.* at Ex. 3, ¶ 4.) The court recognizes that the

CCL Report builds upon the core opinions expressed in original Expert Report that Gilbane had

to contribute more resources and manpower to the Project as the result of events and actions

beyond its control. In that respect, the CCL Report resembles a supplemental report. *See*

*Allstate*, 1999 WL 203349, at *6. However, although there is a link between the original Expert

16

Report and the CCL Report, the CCL Report significantly expands upon the original Expert

Report. The original Expert Report consists of a fourteen-page narrative opinion, a graph

depicting the amount of manpower originally anticipated compared to the actual manpower

expended on the Project, the experts' resumes, and five exhibits relating to the project schedule

update. The CCL Report, in contrast, consists of a thirty-seven page narrative opinion, the

previously-disclosed manpower graph, the experts' resumes, and thirty-five additional exhibits

relating to multiple updates to the project schedule; many of those exhibits are detailed computer

reports. The extensive nature of the additional information persuades the court that the CCL

Report is closer to a new report than a supplemental report.

The fact that the CCL Report was prepared by a different (albeit previously-disclosed)

expert is even more significant.[12] Through the CCL Report, Gilbane intends to change the expert

witness who will testify at trial regarding scheduling analysis. Karaskiewicz, Kocko and

Rothamer prepared the Expert Report and were disclosed as Gilbane's scheduling experts, yet as

Gilbane explained at the hearing on March 22, 2005, if Gilbane is allowed to use the CCL

Report, Callahan would be Gilbane's expert witness at trial regarding scheduling analysis,

replacing Karaskiewicz, Kocko and Rothamer. In the court's view, however, the concept of a

supplemental report suggests that the supplemental opinions will be the opinions of the expert

who prepared the original report, not the opinions of a different expert.

Gilbane disagrees, countering that under the plain language of Rule 26(e)(1), although the

---

[12]To the extent HSB argues that the CCL Report is the report of Shafter, Chelluri and
Streiler, not Callahan, the court disagrees. The CCL Report was prepared under Callahan's
direct supervision, and Callahan would be the testifying expert at trial regarding the report.
Nothing precludes an expert from using assistants to formulate the expert opinion and prepare the
report. *See Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002).

17

party is required to supplement its expert reports, there is no requirement that the original expert supplement the report. This argument is not persuasive. For one thing, Gilbane cites no case in which the supplemental report was submitted by any witness other than the originally disclosed expert, nor has the court found such a case. Moreover, although Rule 26 does not explicitly address the issue, nothing in Rule 26 suggests that a party can use a supplemental report to substitute experts. Rule 26(a)(2) requires a party to disclose the identity of its expert witness, together with a written report prepared and signed by the expert witness disclosing the substance of the testimony the expert expects to offer during direct examination. *Smith v. Union Pac. R.R. Co.*, 168 F.R.D. 626, 628 (N.D. Ill. 1996); Fed. R. Civ. P. 26(a)(2) and advisory committee's note. It logically follows that a supplemental report—the purpose of which is to disclose modifications to the substance of the expert's testimony—should disclose what the testimony of the originally-disclosed expert will be, not what the testimony of a different witness will be. Here, the CCL Report reflects the opinion of Callahan, not the opinions of Karaskiewicz, Kocko and Rothamer. The court thus concludes that the CCL Report does not qualify as a supplement to the original Expert Report.

The fact that Gilbane previously disclosed Callahan as an expert witness in this case does not alter the court's decision. Gilbane disclosed Callahan as its expert in scheduling methodology, not as the expert who would testify regarding the actual scheduling analysis. Just as the CCL Report cannot be fairly characterized as a supplement to the Expert Report, nor can it be characterized as a supplement to Callahan's previous expert report. Adding the actual scheduling analysis to the scope of Callahan's testimony goes well beyond the scope of his previously disclosed testimony, and thus is tantamount to a new expert disclosure made after the

18

court-ordered deadline for expert disclosures. Accordingly, the court must analyze the CCL

Report under Rule 37(c) and determine whether the untimely disclosure in violation of Rule

26(a) violation is either justified or harmless.

### C.     The Untimely Disclosure of the CCL Report is Neither Justified Nor Harmless

As explained earlier, in assessing whether the untimely disclosure of the CCL Report is

either justified or harmless, the court considers the prejudice to the District and HSB, the ability

to cure such prejudice, and Gilbane's justification (or lack thereof) for not disclosing the

evidence earlier.[13] *David*, 324 F.3d at 857. Consideration of these factors leads to court to

conclude that Gilbane should have advised the court and the parties of its intention to revise the

expert opinions much earlier, that the late disclosure of the CCL Report will unduly prejudice the

District and HSB, and that the court cannot alleviate the prejudice. Accordingly, the court finds

it necessary to bar Gilbane from using the CCL Report at trial.

As an initial matter, Gilbane's decision to delay notifying the court and the other parties

of its intention to revise its expert opinions regarding the scheduling analysis is unjustifiable.[14]

Gilbane could have informed the court that it needed to substantially revise its expert opinions

when HSB filed its *Daubert* challenge in January instead of, or in addition to, opposing the

*Daubert* motion. Instead, Gilbane opposed the *Daubert* motion on the merits, and chose not to

---

[13]The court has not considered the likelihood of disrupting the trial because this court has no authority to alter the schedule in a manner that would affect the district court's trial date.

[14]Although the court finds the delay unjustifiable, the court does not believe that Gilbane acted in bad faith. *See David*, 324 F.3d at 857.

19

inform the court that it was working to revise the Expert Report.[15] Likewise, Gilbane could have

raised the issue in early February before Judge Pallmeyer moved the trial date forward, or even in

late February before the court set the expert discovery schedule. Instead, Gilbane waited until

March 11, 2005—when expert depositions were about to begin—to bring its emergency motion

to supplement. Even then, Gilbane failed to make clear to the other parties and to the court the

scope of its proposed revisions to the expert opinions, and the fact that Callahan would now be

the scheduling expert rather than just a methodology expert. With earlier notice, the court could

have dealt with the revised expert opinions and set an expert discovery schedule that was fair to

all the parties.[16]

At this point in time, however, with just six weeks left for the parties to conduct expert

discovery, allowing Gilbane to use the CCL Report would punish HSB and the District for

Gilbane's delay. When Gilbane sought leave to supplement, it represented that supplementation

would have no effect on the April 4, 2005 deadline for deposing Gilbane's and the District's

experts. Having not seen the CCL Report yet (and having no idea that the proposed supplement

was a new report from Callahan, rather than a supplemental report from the Gilbane employee-

experts), the court accepted that representation, but explicitly told Gilbane that the April 4, 2005

---

[15]In its opposition brief, Gilbane stated in a footnote that to the extent HSB challenged the
expert report as incomplete, "the appropriate remedy would be for Gilbane to supplement its
report instead of barring Gilbane's witnesses from testifying." (Gilbane's Resp. Daubert Mot. at
11, n.12.) Gilbane's suggestion of what constitutes an appropriate remedy falls far short of
providing notice that it had begun working to revise the Expert Report.

[16]The court recognizes that the CCL Report was not completed until March 18, 2005. But
if Gilbane had disclosed that it was working on the CCL Report earlier, the court would have
ordered Gilbane to expedite the preparation of the report and set the expert discovery schedule
accordingly.

deadline could not be changed. Now that the court has seen the CCL Report, it is clear that it

would be unduly burdensome and prejudicial (if not impossible) for the District and HSB to

analyze a thirty-seven page report with substantial exhibits, revise their preparation for expert

depositions, and complete the depositions of Gilbane's experts by the scheduled deadline for

those depositions.[17] As it stands, neither the District's expert nor Gilbane's previously-disclosed

experts Callahan, Rothamer, Karaskiewicz and Kocko have been deposed yet. If Gilbane were

allowed to use the CCL Report, the District and HSB would also have the right to depose the

three new expert witnesses who worked with Callahan on the CCL Report (Shafter, Chelluri and

Streiler), even if only Callahan would testify at trial.[18] Even focusing solely on the final

discovery deadline, the parties already have a significant amount of discovery to complete before

the May 16, 2005 deadline. Adding a substantive new expert report, which would likely take the

opponents' experts several weeks to analyze,[19] and three new potential deponents to an already

---

[17]As it turns out, the April 4, 2005 deadline had to be extended because the depositions of
Gilbane's and the District's experts were delayed while the District and HSB waited to receive
the CCL Report, and were delayed again while the parties waited for a decision on HSB's motion
to strike. The parties have negotiated an agreed-upon schedule to complete those depositions by
April 15, 2005 without altering the final deadline of May 16, 2005.

[18]Gilbane suggests that only Callahan would need to be deposed because Shafter, Chelluri
and Streiler were his assistants, and Callahan would be the testifying expert regarding the CCL
Report. Gilbane is correct that "[a]n expert witness is permitted to use assistants in formulating
his expert opinion, and normally they need not themselves testify." *Dura*, 285 F.3d at 612.
However, that has no effect on the District and HSB's right to depose Shafter, Chelluri and
Streiler. "The opposing party can depose [the assistants] in order to make sure they performed
their tasks competently; and the expert witness can be asked at his deposition whether he
supervised them carefully and whether his relying on their assistance was standard practice in his
field." *Id.* at 613.

[19]This estimate is based on a representation by the District's counsel at the March 22,
2005 hearing.

21

tight discovery schedule simply is not fair to the District and HSB. They did not create this problem, and they should not be penalized for Gilbane's delay.

Furthermore, the prejudice to the District and HSB cannot be cured. The problem is a lack of time. The final pretrial order is due on June 2, 2005 and the trial is scheduled to commence on June 27, 2005. This court has no authority to change those dates. And although the court does have authority to change the final discovery cutoff, the reality is that the expert discovery schedule is already as tight as it can get. After the May 16, 2004 discovery cutoff, the parties have only seventeen days to prepare the final pretrial order, and then have less than three and a half weeks to prepare for trial. If there were more time, the court could cure the prejudice by adjusting the remaining discovery schedule to give the District and HSB adequate time to analyze the CCL Report while preserving ample time for the rest of expert discovery (*e.g.*, depositions of HSB's experts and any rebuttal experts). But considering the time constraints, together with Gilbane's unjustifiable delay and the prejudice of the delayed disclosure to the District and HSB, the court finds its only option is to bar Gilbane from using the CCL Report.

**D.    The CCL Report Exceeds the Scope of Rebuttal Opinions**

As an alternative argument, Gilbane contends that the CCL Report is a rebuttal report offered in response to Manzi's opinion "that a delay analysis cannot be prepared in this case absent a full CPM schedule that covers the entire duration of the Project." (Gilbane Resp. Emerg. Mot. Strike at 23.) Rebuttal disclosures are not due until May 2, 2005, so if Gilbane is correct, the CCL Report is not untimely. The CCL Report, however, is not a rebuttal report.

Under Rule 26(a)(2) of the Federal Rules of Civil Procedure, "rebuttal disclosures are those that relate to evidence that is 'intended solely to contradict or rebut evidence on the same

22

subject matter identified by another party' in its expert disclosures." *Aircraft Gear Corp. v. Marsh*, No. 02 C 50338, 2004 WL 1899982, at *5 (N.D. Ill. Aug. 12, 2004) (quoting Fed. R. Civ. P. 26(a)(2)). As the District and HSB aptly point out, the CCL Report is not limited to an opinion regarding whether a scheduling analysis can be prepared in this case, which would be proper rebuttal evidence to Manzi's opinion. Rather, the CCL Report is much broader. As the introduction to the CCL Report states, CCL's analysis measures "the effects of a multitude of delays that occurred at both the Downers Grove North and South High School projects that resulted in substantial additional manpower and additional costs by Gilbane." (CCL Report at 2.) It is clear that the CCL Report is not offered merely to establish that a scheduling analysis can be done, but to present the results of the actual scheduling analysis to prove Gilbane's case-in-chief. Because the CCL Report goes far beyond rebutting the opinions expressed in Manzi's expert report, the CCL Report is not a rebuttal report. *C.f. Long Term Capital Holdings v. United States*, No. 3:01 CV 1290 (JBA), 2003 WL 21518555, at *2 (D. Conn. May 15, 2003) (purpose of expert rebuttal report is to rebut opinions expressed by opposing party's expert).

Although Gilbane may not use the CCL Report as a rebuttal opinion, Gilbane is entitled to offer evidence from Callahan to rebut Manzi's opinions. Disclosures of rebuttal experts and their opinions are due by May 2, 2005.

## III.   CONCLUSION

For the reasons explained above, the court grants HSB's *Emergency Motion to Strike Gilbane's Supplemental Expert Report and for Sanctions*, which the District joined, to the extent HSB and the District ask the court to bar Gilbane from using the opinions set forth in the CCL Report at trial, and awards HSB and the District reasonable attorneys' fees incurred relating to

23

the motion to strike under Rule 37(c) of the Federal Rules of Civil Procedure. On or before April 15, 2005, HSB and the District shall submit a statement of the fees they incurred relating to the motion to strike to Gilbane. The parties are ordered to meet and confer regarding the fee statement(s) in an effort to agree upon what constitutes a reasonable fee award. In the event the parties cannot agree, HSB and the District shall submit their fee statement(s) to the court on or before April 29, 2005, and Gilbane shall have until May 6, 2005 to file objections to the fee statement(s). The court denies the motion to strike to the extent HSB and the District seek additional sanctions and/or relief.[20] Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties have ten days from the receipt of this order to serve and file objections to the order with the district court.[21]

ENTERED:

NAN R. NOLAN

United States Magistrate Judge

Dated: April 5, 2005

---

[20]Specifically, to the extent HSB and the District ask the court to sanction Gilbane by dismissing Gilbane's complaint, barring Gilbane from introducing any testimony regarding its original Expert Report, striking Callahan's expert report, and barring Karaskiewicz, Kocko, Rothamer and Callahan from testifying, the motion to strike is denied.

[21]To the extent HSB and the District ask the court to provide expedited review of the court's ruling to the district court, that request is likewise denied. The parties are entitled to ten days under Rule 72 of the Federal Rules of Civil Procedure.